[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PETITIONFOR TERMINATION OF PARENTAL RIGHTS
On December 29, 1992, the Commissioner of the Department of Children and Families (hereinafter referred to as "DCF") filed a petition (TPR) seeking to terminate the parental rights of the respondent mother and respondent father regarding the minor child, Caroline M. At the time of trial, respondent father consented to termination of his parental rights. The petition for termination of mother's parental rights was amended at the time of trial with no objection from any party; it was based on the following statutory grounds:
 (1) The child has been abandoned by the mother in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. [§ 17a-122(b)(1)]
 (2) The child has been found in a prior proceeding to have been neglected or uncared for. The mother has failed to achieve such CT Page 8437 degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. [§ 18a-112(b)(2)]
 (3) The child has been denied by reason of act or acts of commission or omission by the mother the care, guidance or control necessary for her physical, educational, moral or emotional well being. [§ 17a-112(b)(3)]
 (4) There is no ongoing parent-child relationship with respect to the mother which is defined as the relationship that ordinarily develops as a result of a parent having met, on a continuing day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child. [§ 17a-112(a)(4)].
The right to terminate parental rights generally is codified in § 17a-112 et seq. of the Connecticut General Statutes. Specifically, § 17a-112(b) states in pertinent part:
 The superior court, upon hearing and notice, as provided in §§ 45a-716 and 45a-717, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, . . . with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year.
Our state courts have recognized that "it is both a fundamental right and the policy of this state to maintain the integrity of the family". In re Juvenile Appeal (83-CD), CT Page 8438189 Conn. 276 (1983). ". . . [C]onsideration of the best interest of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination." In re BarbaraJ., 215 Conn. 31 (1990). This compliance with statutory procedure is not inconsistent with concern for the best interest of the child. In re Juvenile Appeal (Anonymous), 177 Conn. 672
(1979). For a more recent discussion of the termination of parental rights and attendant authority, see In re Jessica M.,217 Conn. 459 (1991) and In re Valerie D., 223 Conn. 492 (1992).
I. PROCEDURAL BACKGROUND
Caroline M. was born on February 1, 1989. An Order of Temporary Custody (OTC) was granted by the Court (Axelrod, J.) on May 2, 1991, on the ground that Caroline was in immediate physical danger from her surroundings and that immediate removal from such surroundings was necessary to insure her safety. As part of the application for the OTC a neglect and uncared for petition was filed. On September 30, 1991, the Court (Teller, J.) found Caroline to be neglected and uncared for and committed her to the care and custody of the Department of Children and Families for a period not to exceed eighteen months. An eighteen month extension of that commitment was granted by the Court (Silbert, J.) on February 9, 1993. As previously stated, a TPR petition, originally as to both parents, was filed on December 29, 1992. Trial on the TPR commenced on April 29, 1994, continued on May 2, 1994, May 17, 1994 and completed on May 23, 1994. At the outset of trial, father represented to the Court that he wanted to consent to the termination. He executed an Affidavit/Consent for Termination of Parental Rights, was fully canvassed, his consent was accepted by the Court, and his rights terminated. Father and his attorney were excused from the remainder of the proceedings. Consequently, the trial proceeded against only respondent mother.
Mother did not show up for court on May 17, 1994 or on May 29, 1994. Her court-appointed attorney was questioned about her absence and raised no objection to the Court proceeding in her absence.
II. BURDEN OF PROOF AND STATUTORY PROCEDURE
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of the filing or the last amendment, by clear and CT Page 8439 convincing evidence. In re Theresa S., 196 Conn. 18 (1985). [See also Connecticut General Statutes § 17a-112(b) and Practice Book § 1049.] Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252 (1985); In re Nicolina T., 9 Conn. App. 598 (1987).
Termination of parental rights proceeds in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal (84-AB), 192 Conn. 254, 264 (1984); In re Nicolina T.f, supra at 602; In re Luke G., 40 Conn. Sup. 316, 324 (1985). Establishment of one or more of the statutory grounds is a mandatory prerequisite to an inquiry regarding the ultimate best interests of the child. Section 17a-112(b) of the Connecticut General Statutes sets forth the statutory grounds for termination. Since that language is set out in the disjunctive, as previously stated, one ground only need be established for the granting of the petition.
III. FINDINGS OF FACT
At trial the petitioner introduced testimony and exhibits through the following witnesses: Dr. Robert D. Meier, clinical psychologist; Melissa Russell, former treatment worker at DCF, Beverly Goulet, Director of Social Services for the City of Norwich; Mary Steelman, Assistant Parent Aide Coordinator of Family Services; Lorraine Semmelrock, treatment worker at DCF; and Sherry Battista, permanency planning social worker at DCF. No other party presented witnesses.
Melissa Russell, currently an intake social worker and formerly a treatment social worker at DCF, testified that she became involved with respondent mother in October of 1989 and continued on this case until April of 1993. Caroline was voluntarily placed out of the home by her mother at that time in 1989, and she was subsequently returned to mother in early 1990. In May of 1991, Caroline was taken from mother's home on an OTC, based on neglect issues, and has remained out of the home in foster care since that time. Caroline was adjudicated neglected and uncared for in late September, 1991, and she has been committed to DCF since that time. An extension of that commitment was granted in February, 1993, effective March 23, 1993. Ms. Russell stated mother did not follow through with CT Page 8440 support of Intensive Family Preservation in the home and lost interest in programs and services provided by DCF. During Ms. Russell's tenure as treatment worker (October 1989 through April 1993), Caroline was never returned to her mother's custody, there were no overnight visits, and mother did not comply with the court-ordered expectations which she signed in September, 1991, despite Ms. Russell's continuous encouragement to get mother to "follow through". (Exhibit, Petitioner's 4.) Mother's visits with Caroline were sporadic at times, and she would often go weeks without calling or contacting DCF. DCF offered to provide mother bus tickets to visit; mother needed to call the foster mother to set up visits; mother failed to do this. Mother started a number of DCF recommended programs and was continuously terminated for her failure to attend. (Exhibit, Petitioner's No. 1, pp. 13 et seq.) Those programs included the Cooperative Extension Expanded Health and Nutrition Program, counseling at Youth Service Bureau, Foster Grandparent Program, Parent Aide Program, the Intensive Family Preservation Services at DCF, and the United Community Services Family Stabilization Program. Ms. Russell indicated that from September of 1992 through April of 1993, she continually told mother to visit Caroline and to obtain individual counseling for which Ms. Russell provided mother with a list of names. Mother told Ms. Russell she did not need therapy; mother refused to attend therapy.
Ms. Russell testified that between April 1992 and October 1992, dates of the first and second treatment plans (Exhibit, Petitioner's No. 5A and 5B) VNA (Visiting Nurses Association) was in the home regularly, a home health aide was in the home five days a week, two hours a day, Dr. Burton developed a birth to three evaluation for Caroline, and mother was continuously reminded about individual counseling and specifically referred to Youth Services Bureau and ABC Counseling. The parent aide program was terminated because mother did not cooperate. In addition, DCF provided the following services, all of which were terminated due to mother's lack of cooperation: Foster Grandparent Program, nutritionist, individual counseling, Family Stabilization Program, two separate VNA services, and a home health aide. During January 1, 1992 through January 1, 1993, mother had weekly visitation twice a week; mother missed sixteen of these visits. Mother only visited with Caroline twice between July, 1992, and April, 1993, despite DCF's having sent her and her husband bus tickets to facilitate the visits. CT Page 8441
Ms. Beverly J. Goulet, Director for the Department of Social Services in Norwich, knew mother both from Ms. Goulet's responsibility in administering the rental assistance program for Norwich and in supervising general assistance for the City. She testified that at various times in the past: mother did not pay her rent, her utilities were shut off, mother illegally sublet her apartment, and mother's home was in a deplorable condition with people sleeping all over the floor.
Ms. Mary Steelman, assistant parent aide coordinator for the Family Services Parent Aide Program, testified that she was originally involved as a parent aide for mother in March of 1992 through July 27, 1992. Most visits went appropriately, although mother had to be encouraged to interact with Caroline and not to visit with neighbors during mother's visitation time. Ms. Steelman worked with mother in the areas of play interaction between mother and child, household budgeting, meal preparation and planning, discipline and "time outs", and safety issues and supervision. Mother showed minimal improvement in these areas. She still had trouble dealing with Caroline's needs versus her own needs. Ms. Steelman referred mother to the Child Development for a Clinic parent/child interaction evaluation; the clinic was unsuccessful in contacting mother. In late July, 1992, Ms. Steelman called mother and received no response. She wrote mother a series of letters to which mother did not respond. (Exhibit, Petitioner's No. 6.) She notified mother in writing that she would visit mother's home in August, 1992; mother was not home and did not reply to Ms. Steelman's letter. Consequently, due to mother's lack of response, Ms. Steelman terminated involvement.
Ms. Steelman saw mother one more time. DCF had referred her to a free parenting course in which Ms. Steelman was involved. Mother did not complete the program. She attended one out of three sessions.
Lorraine Semmelrock, a DCF treatment worker, first became involved with mother when her second daughter, Tabitha, was born in January of 1993. Ms. Semmelrock took over Caroline's case and the entire family case in mid-April, 1993. At that time, the TPR was pending. Between July, 1992, and April, 1993, mother visited Caroline two times. Between May, 1993, and July, 1993, mother regularly visited with Caroline one time per week. In August of 1993, mother's visits again CT Page 8442 decreased dramatically. During this time, mother was having marriage problems, had criminal matters pending in the G.A., and attempted suicide. Ms. Semmelrock encouraged mother to visit Caroline and to seek individual counseling. Between August, 1993, and December, 1993, mother visited her daughter three times and telephoned her on four consecutive days in September and six consecutive days in late November and early December. In July of 1993, Ms. Semmelrock referred mother to ABC Counseling; mother did not keep four appointments. In August of 1993, Ms. Semmelrock gave mother an application for a teaching homemaker; mother never filled out the application. Ms. Semmelrock also gave mother information about the Foster Grandparents Program; mother did not follow through with information she received. At this same time, Ms. Semmelrock also reapplied for the Parent Aide Program from which mother had been terminated in August of 1992. If mother improved her situation and met the court-ordered expectations, DCF would withdraw the petition.
Mother did attend two visits at Backus Hospital subsequent to her attempted suicide in late August 1993, and after referral through the Public Defender's Office. She never followed through with the treatment plan of October 1, 1993, which promoted consistency and stability in Caroline's life. DCF moved Caroline to a foster home closer to mother in August of 1993; still mother's visitation was both sparse and sporadic.
Sherry Battista, a DCF permanent planning social worker, took over mother's case in January of 1994. Mother cancelled her first appointment on January 13, 1994, did not respond to two subsequent letters sent by Ms. Battista, did not appear for her February 25, 1994, appointment, and when mother met with her on March 1, 1994, stated she could not give DCF her new address and did not feel she needed counseling. Mother cancelled her appointment on March 8, 1994, missed visitation with Caroline on March 14, 1994 because she was over one hour late and failed to have any contact with DCF since that date. Ms. Battista also discovered that mother had been terminated from her AIC program as she missed nine appointments with her counselor at Backus Hospital.
Dr. Robert D. Meier, a licensed psychologist, conducted court-ordered evaluations of both mother and Caroline in July of 1993. (Exhibit, Petitioner's No. 3) At that time, he felt that mother should be given an opportunity for CT Page 8443 improvement, if mother was using the provided services and relying on DCF's recommendation. However, if mother failed to comply and failed to be consistent, it would be detrimental for the child not to move toward permanency. Mother had improved since 1991, but Dr. Meier acknowledged that there are still problems with mother's ability to parent as she has great difficulty making decisions and she makes poor judgments. Mother would need continued counseling over an extended period of time, and mother feels there is no need for counseling. Mother has a definite problem conceptualizing her need for long-term treatment.
Dr. Meier felt that mother would need DCF to supervise her to a certain extent: providing her with phone numbers, dates and times for appointments and/or visits. Mother has the ability to get where she is supposed to be when she is supposed to be there. Mother told Dr. Meier that she was both aware of her appointments and was attending them. In all likelihood, he concluded that mother would not benefit from additional time to attempt to reunify with Caroline; the prognosis of any significant change in mother's ability to parent was very poor at the time of trial.
IV. THE TERMINATION RE: CAROLINE M.
The petitioner alleged four statutory grounds for the termination of respondent mother's parental rights: abandonment, failure to rehabilitate, acts of commission or omission, and no ongoing parent/child relationship. Those grounds are addressed separately below.
(1) Abandonment [§ 17a-112(b)(1), Connecticut GeneralStatutes.
The test for determining abandonment focuses on the conduct of the parent. In re Juvenile Appeal (Docket No. 9489),183 Conn. 11 (1981). ""[W]here a parent fails to visit a child, has no personal interaction with the child, and shows no concern for the child's welfare, statutory abandonment has occurred."In re Migdalia M., 6 Conn. App. 194 (1986), cert. denied199 Conn. 809 (1986). The statutory standard is whether the parent maintained a reasonable interest, concern or responsibility as to the welfare of the child. In re Rayna M., 13 Conn. App. 23
(1987). CT Page 8444
In the case at bar, the petitioner has proven by clear and convincing evidence that mother abandoned Caroline. The evidence supports that mother's course of conduct did not show "any reasonable degree of interest, concern or responsibility" as to the welfare of her daughter. Caroline has been in placement since May of 1992. Since that time, mother's contact with the child has been sporadic at best. For a period in late 1991, mother maintained contact with Caroline but then terminated contact for an extensive period of time. mother [Mother] reinstituted contact again for approximately three months in 1991 (May thru July). Between January 1, 1992 and January 1, 1993, mother missed sixteen visits, between July, 1992, and April, 1993, a total of ten months, mother visited twice. Mother only visited Caroline three times between August, 1993, and December, 1993. Since January 1994, mother has not seen her daughter despite DCF's ongoing attempts to set up visitation. Court-appointed counsel for mother contends this was because mother needed more assistance in complying with visitation. The Court is not persuaded by this argument. Rather, the evidence clearly and convincingly shows that mother knew what she had to do over the course of the last three years of Caroline's placement in order to effectuate visitation and chose not to do so on any type of consistent basis. Mother could not even "express enough personal concern for the general well being of her child", In re Rayna M., supra, to come to court on each of the trial dates concerning the TPR. Her absence on May 17, 1994, was despite the fact that she was in court on the date the continuance was set, and her absence on May 24, 1994, was despite the fact that her attorney advised her her presence was necessary.
(2) Failure to Rehabilitate [§ 17a-112(b)(2),Connecticut General Statutes.
Personal rehabilitation means "the restoration of a parent to his or her constructive and useful role as a parent".In re Migdalia M., 6 Conn. App. 194, 203 (1986), cert. denied.199 Conn. 809 (1986). In order to prove "failure to rehabilitate" the petitioner must show that "the parents of [previously adjudicated] neglected or uncared for child have failed to rehabilitate as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in their child's life."In re Rayna M., 13 Conn. App. 23 (1987). The statute requires this court to look at the level of the parents' rehabilitation CT Page 8445 as it relates to a particular child. In re Luis C., 210 Conn. 157,167 (1989). What constitutes a reasonable time period in which rehabilitation is effectuated is a question of fact for the court. In re Davon M., 16 Conn. App. 693, 695-6 (1988).
In the instant case, Caroline was adjudicated neglected and uncared for on September 30, 1991. An extension of the Court's commitment was granted on February 9, 1993.
Counsel for mother argues that petitioner has failed to prove this ground by clear and convincing evidence because DCF did not provide mother with the needed services in a timely manner to allow her to rehabilitate herself. This Court is not persuaded. At the time of Caroline's commitment, mother was told that she would need to accomplish certain goals to effectuate reunification. (Exhibit, Petitioner's No. 4.) These included: individual counseling, parenting classes, securing and maintaining adequate housing with at least two bedrooms, and cooperating with DCF and other service providers. Despite the fact that mother has had almost three years since the original adjudication and commitment to comply, she has consistently not complied.
While it is true that mother has made some progress at some times, this progress has been inconsistent and eventually tapered off into nonexistence. Mother's failure was self-inflicted and not due to any default on the part of DCF. As counsel for Caroline correctly recites:
 Mother was enrolled in Cooperative Extension Expanded Health and Nutrition program This enrollment was prematurely terminated by the provider due to mother's uncooperativeness. The Foster Grandparent Program was terminated because of mother's lack of motivation. Diane Page, mother's first parent aide, terminated due to mother's failure to keep appointments. In September 1993, Mary Steelman, mother's subsequent parent aide, terminated services due to mother's lack of follow through. The Intensive Family Stabilization Program was terminated due to missed appointments by mother. Youth Services Bureau counseling was terminated because of mother's missed CT Page 8446 appointments. United Community Services Family Stabilization program was terminated due to mother's failure to show up for numerous appointments.
 During this same time period in the summer of 1993, mother was arrested for Risk of Injury to a Minor regarding children for whom she was babysitting. Shortly thereafter, mother attempted suicide. Because of these two incidents, other social service agencies became involved with mother. These entities attempted to assist mother and offered her services outside the purview of the Department.
 In August, 1993, Backus Hospital referred mother to the partial hospitalization program after the suicide attempt. Notwithstanding the chaos swirling around her and the court expectations, mother claimed not to need counseling. Not until November did mother enroll in a course of counseling. Unfortunately, this counseling was prematurely terminated after mother missed eight (8) consecutive appointments. After mother's arrest for risk of injury, she was referred to the Alternative Incarceration Program. Shortly thereafter, she was rearrested for violation of probation for failure to comply with the conditions of her probation. She was administratively terminated from this program.
 Finally, Mary Steelman, parent aide, testified that in the spring of 1993, she encouraged mother to attend a parenting class sponsored by her agency. Mother attended the first session, but never completed the course.
(See Brief of Child, pp. 8 and 9.)
As Dr. Meier himself concluded in his July, 1993, CT Page 8447 psychological evaluation: "Any significant failure to remain consistent or to follow through, however, should lead to immediate actions to provide this child with a more stable and secure permanent home environment." (Exhibit, Petitioner's No. 3, p. 8.)
Based on these facts, the Court concludes that petitioner has proven by clear and convincing evidence that mother has failed to rehabilitate herself.
(3) Acts of Commission or Omission [§ 17a-112(b)(3),Connecticut General Statutes.]
Case law defining the acts of omission or commission ground is sparse. This ground does not require a prior finding of neglect or uncared for. This ground may be proven by direct or indirect evidence; "the law does not distinguish between direct and circumstantial evidence as far as probative force is concerned." State v. Cimino, 194 Conn. 210 (1984). See In reJuvenile Appeal (85-2), 3 Conn. App. 184 (1985).
Petitioner argues that mother's lack of consistency overall as to her care of Caroline has had a significant effect on the child's level of comfort and sense of security. As previously indicated, mother's failure at rehabilitation and ultimately her failure at reunification has been her lack of consistency. Mother started programs enthusiastically and with the best intentions, and gradually, and usually quickly, lost interest and failed to successfully complete anything. Mother's inconsistency is akin to an omission in her daughter Caroline's life. Such an omission was committed as recently as March 14, 1994, when mother failed to show in a timely fashion for visitation with Caroline.
A court is entitled to draw whatever inferences it finds reasonable and logical based on the facts. In reChristine F., 6 Conn. App. 360 (1986). This Court concludes that mother has omitted acts of consistency in Caroline's life which have greatly affected both her level of comfort and security. This Court finds that the petitioner has established this ground by clear and convincing evidence.
(4) No Ongoing Parent/Child Relationship[§ 17a-112(b)(4), Connecticut General Statutes.]
CT Page 8448
Petitioner withdrew this statutory ground in its brief. Consequently, the Court will not address this ground.
IV. BEST INTERESTS
This Court has found by clear and convincing evidence that three statutory grounds alleged by the petitioner for the termination of respondent mother's parental rights have been proven. This Court must now consider and make findings on the criteria set out in § 17a-112(d) of the Connecticut General Statutes, as amended. These criteria and this Court's findings as to each follow.
(1) Services Offered: Respondent mother argues that petitioner only offered mother services during 1991 and 1992 and made "woeful efforts" to assist her. The evidence belies that conclusion. DCF provided mother with a multitude of services (See Section IV (2), Memorandum of Decision, supra, at pp. 14-15.) Mother did not follow through. In many instances when DCF attempted to reestablish previous services, service providers were unavailable due to mother's previous history of failure to follow through. There was testimony that mother might need a little more direction than other individuals, but the record is absent of any showing that DCF did not provide this direction. On the contrary, all DCF workers and mother's parent aide consistently testified that they tried over and over again to maintain mother's interest in programs and focus her on reunification with Caroline.
(2) Reasonable Efforts for Reunification: DCF worked with respondent mother to attempt reunification by encouraging visitation, setting it up, and even voluntarily paying transportation to it. DCF continually reminded mother of the necessity for individual counseling and provided her with ample information to obtain the same.
(3) Court Orders: Mother complied with a court-ordered psychological evaluation. She did not comply with court-ordered expectations of September 30, 1991.
(4) Feelings and Emotional Ties of the Child: Caroline was disappointed about her mother missing a scheduled visit in April of 1994. Similarly, she showed disappointment when mother missed a visit in August of 1993, and Caroline has not seen her since then. Caroline seemed to enjoy her visits CT Page 8449 with mother although she never asked that they be extended or increased. Caroline has a good relationship with her foster family.
(5) Age of the Child: Caroline was born February 1, 1989. She is presently five and one-half years old. She has been in foster care since she was approximately two and one-half years old.
(6) Efforts to Adjust: As previously stated, mother made inconsistent and ultimately unsuccessful attempts to rehabilitate herself. She consistently failed to follow through with anything, including attending all days of this trial.
(7) Interference with Relationship: There is no evidence which supports that petitioner or anyone else interfered with mother's ability to maintain a relationship with Caroline.
This Court finds that the evidence is clear and convincing that the best interests of Caroline are served by the termination of her mother's parental rights.
V. CONCLUSION
The petition seeking the termination of mother's parental rights with respect to Caroline is hereby granted. Judgment may enter terminating respondent mother's parental rights of Caroline. Pursuant to Connecticut General Statutes § 17a-112(b), it is further ordered that DCF be appointed statutory parent so that Caroline can be placed for adoption. The statutory parent shall report to the Court within ninety (90) days on a care plan for Caroline and shall submit reports at least every twelve (12) months thereafter until such time as any proposed adoption plan has become final.
Handy, J.